## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

_____ FILED _____ ENTERED
_____ LODGED _____ RECEIVED

NOV 2 1 2000

AT GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

| | |
|---|---|
| CAROLE ANNE MCINTYRE, et al., | * |
| | * |
| Plaintiffs, | * |
| v. | * |
| | * |
| BISHOP L. ROBINSON, et al., | * |
| | * |
| Defendants. | * |
| | * |

Civil No. PJM 95-190

\* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| STEPHEN M. JOHNSON, et al., | * |
| | * |
| Plaintiffs, | * |
| v. | * |
| | * |
| BISHOP L. ROBINSON, et al., | * |
| | * |
| Defendants. | * |
| | * |

Civil No. PJM 94-2871

\* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| DESMOND MALCOLM, | * |
| | * |
| Plaintiff, | * |
| v. | * |
| | * |
| PARRIS GLENDENING, et al., | * |
| | * |
| Defendants. | * |

Civil No. PJM 98-4109

## <u>OPINION</u>

1

43

The Plaintiffs in these consolidated cases are current or former prisoners of the State of Maryland.[1]  They allege that during the course of their confinement they have been involuntarily exposed to "environmental tobacco smoke" (ETS) to an extent violative of the Eighth Amendment to the United States Constitution, the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 794.  With one exception, Defendants are or have been correctional administrators employed by the State of Maryland.[2]  Plaintiffs seek (1) a

---

[1]

Although there are more than five Plaintiffs in the three captioned proceedings, pursuant to an agreement of counsel the claims of five of them have been designated as fairly representative for purposes of the present motions. The Representative Plaintiffs are the three named Plaintiffs, Carol Ann McIntyre, Steven M. Johnson, and Desmond Malcolm, plus Winston Lloyd and James Minniefield-El. The facts related to the incarceration of each are set out in Appendix A hereto, Magistrate Judge Schulze's Recommended Findings of Fact with respect to Plaintiffs, which, except to the extent inconsistent with the main text, the Court adopts as its own.

In addition to the three captioned cases, several other prisoner cases raising the ETS issue have been stayed pending resolution of the present cases.

[2]

The principal named Defendant is Bishop L. Robinson who, until October, 1997, was Secretary of the Maryland Department of Public Safety and Correctional Services. He was replaced at that time by Defendant Stuart O. Simms. Other named Defendants have served as wardens or correctional officers at different times at different facilities throughout the State. Defendant Parris Glendening is the Governor of Maryland.

Although the parties have not raised it, an issue exists with regard to capacity in which Defendants have been sued. Presumably, with regard to the § 1983 claim, in order to avoid the Eleventh Amendment's sovereign immunity problem insofar as damages are sought, Defendants are being sued in their individual capacities and, insofar as injunctive relief is sought, in both their individual and official capacities. *See Kentucky v. Graham*, 473 U.S. 159 (1985). However, liability under the ADA and Rehabilitation Act is imposed upon "public entities" and no sovereign immunity doctrine applies. Individual liability under the Acts, therefore, is highly doubtful. *See, e.g., Shariff v. Artuz*, No. CIV.A. 99-0321, 2000 WL 1219381, at *5 (S.D.N.Y. Aug. 28, 2000). The Court will assume that the ADA/Rehabilitation Act actions are against Defendants in their official capacities only, hence the equivalent of claims against the Maryland Department of Corrections or the State of Maryland. *See Graham,* 473 U.S. 159.

2

declaration that Defendants' written smoking policies and practices regarding smoking violate the Eighth Amendment; (2) an injunction that either prohibits Defendants from allowing smoking inside state correctional institutions or from any areas in which Plaintiffs spend time or that requires that Plaintiffs be offered housing in a tobacco-free facility; and (3) an award of compensatory and punitive damages, costs, and attorneys' fees.

In early 1998 Plaintiffs filed a Motion for Summary Judgment, Preliminary Injunction, and Permanent Injunction, to which Defendants responded by filing their own Motion to Dismiss or, in the Alternative, for Summary Judgment. The Court referred these Motions to Magistrate Judge Jillyn K. Schulze for a hearing and recommended findings of fact and conclusions of law. The parties later withdrew their Motions in light of Judge Schulze's orders reopening discovery and allowing Plaintiffs to file a Second Amended Complaint adding the ADA and Rehabilitation Act claims, then renewed their Motions after the additional discovery period ended.

Judge Schulze has held a hearing and has issued her Report and Recommendation. In it, she recommends that Plaintiffs' Motion be granted as to the declaratory and injunctive relief they seek but denied as to damages. She recommends that Defendants' Motion be denied as to their liability for declaratory and injunctive relief and certain damage claims, but granted as to other damage claims. The parties have filed objections to Judge Schulze's recommendations which the Court now considers.

The Court will SUSTAIN certain of Defendants' objections and OVERRULE others. It will OVERRULE Plaintiffs' objections. The net result is that the Motions of both sides will DENIED as to declaratory and injunctive relief, Plaintiffs' Motion will be DENIED as to damages,

3

and Defendants' Motion will be GRANTED as to certain of Plaintiffs' damage claims and DENIED as to others.

## I. Facts

On October 1, 1987, Defendant Robinson, as Secretary of the Maryland Department of Public Safety and Correctional Services, issued a directive stating that "reliable medical evidence reveals that smoking is hazardous not only to the health of those who smoke, but also can adversely impact the health of nonsmokers exposed to smoke from tobacco products." The directive imposed several restrictions on smoking by department employees. In 1992, after Governor William Donald Schaefer banned smoking in all state facilities other than those housing clients, patients, inmates and wards of the State, Robinson issued a further directive banning indoor smoking by Division of Correction employees and visitors. Prison administrators were ordered to designate, clearly mark, and adequately ventilate indoor smoking areas and were instructed to prohibit indoor smoking in all areas not so designated. The directive noted that "[s]trong evidence exists that smoking is a proven cause of cancer in smokers and non-smokers alike" and that "tobacco smoke can aggravate cardiac, respiratory, and allergic conditions suffered by these same groups, shortening their life spans and its [sic] qualities." After the Maryland Department of Licensing and Regulations prohibited smoking in enclosed workplaces based on its finding that ETS causes lung cancer and increases heart disease in non-smokers, Robinson, effective July 1, 1995, banned all indoor smoking in Maryland prisons.

Plaintiffs have produced evidence that, despite the ban on indoor smoking, ETS remains prevalent in Maryland prisons. Dr. S. Katherine Hammond, an industrial hygienist with expertise in measuring airborne nicotine levels as a marker for ETS, analyzed readings taken from a total of seven nicotine monitors placed among cells and day rooms at the Roxbury Correctional

4

Institution (RCI), the Eastern Correctional Institution (ECI) and the Maryland Correctional Institution - Jessup (MCI-J).[3] According to her report, the nicotine measurements ranged from a low of 1.8 micrograms per cubic meter (ug/m3) to a high of 13.3 ug/m3,[4] with four of the seven monitors showing nicotine concentrations higher than 2.3 ug/m3.[5] In addition, two of three urine samples Plaintiffs submitted for analysis in September 1998 contained levels of cotinine (the primary metabolite of nicotine)[6] indicating "heavy exposure to ETS in the days prior to sample collection."[7]

---

[3]

A total of nine monitors were placed in the three facilities. This was done by a paralegal employed by Plaintiffs' counsel. When the paralegal returned to retrieve the monitors one week later, two of the nine were missing. Consequently, Dr. Hammond's report refers to results obtained from only seven monitors.

[4]

Dr. Hammond testified that one would expect nicotine concentrations of 1.8 ug/m3 in "a home that has smokers in it," whereas nicotine concentrations of 13.3 ug/m3 would be expected in "a bar where smoking was allowed."

[5]

Occupational exposure to nicotine concentrations at this level over forty years, according to Dr. Hammond, would increase a person's risk of developing lung cancer to such an extent that federal regulatory agencies would "almost always act to reduce" the risk.

[6]

The cotinine level in urine shows the amount of nicotine a person has inhaled. "Cotinine in saliva, blood and urine is the most widely accepted biomarker for integrated exposure to both active and passive smoking and ETS by virtue of its longer half-life than nicotine in bodily fluids." U.S. Department of Labor, Occupational and Safety and Health Administration, 59 CFR, No. 65 at 15591.

[7]

The three samples -- submitted by Plaintiffs Johnson, Minniefield-El, and Lloyd -- showed cotinine levels of 2.00 nanograms per mililiter (ng/ml), 131.3 ng/ml, and 375.1 ng/ml respectively. These results were reported by Nancy J. Haley, Ph.D., Assistant Vice President and Laboratory Director for the Metropolitan Life Insurance Company, who also opined that Johnson's continued level of 2.00 indicated only "minimal exposure" to ETS, and that Lloyd's and Minniefield-El's creatinine levels indicated that their "fluid intake was low or physical exercise was high" in the days prior to sample collection.

Plaintiffs have submitted numerous affidavits by inmates and correctional officers attesting to the existence of ETS in Maryland prisons.

Defendants have offered counterevidence on the issue of ETS levels. Their expert, Dirk F. Moore, Ph.D., a biostatistician and assistant professor in the Department of Statistics at Temple University, points out several problems with the sampling methodology Dr. Hammond used to obtain her nicotine measurements. These include her failure to: (1) follow her normal practice of inspecting the site before sampling; (2) supervise placement of the monitors; (3) account for variations in ventilation by only collecting samples during a single seven-to-ten day period in the middle of winter; (4) assess measurement error; (5) use control monitors to test the accuracy of the measurements; and (6) adequately address the possibility of tampering. As a result, Dr. Moore concludes that the actual ETS exposure experienced by inmates "could have been substantially lower than reported." Defendants also cite tests performed on urine samples provided by several of the Plaintiffs in 1995, before Secretary Robinson banned indoor smoking entirely, which indicated that only one Plaintiff, if any, had been exposed to more than a minimal amount of ETS.[8] Additionally, Defendants cite their own deposition testimony and affidavits to the effect that personally they have encountered little evidence of ETS and have received few complaints about it.

Plaintiffs have produced evidence that exposure to ETS has had and will continue to have an adverse impact on their health.[9] Alfred Munzer, M.D., a physician specializing in internal

---

[8]

The one exception was Plaintiff Lloyd, whose urinary cotinine level was comparable to that of a person who smokes at least 8 cigarettes per day. Although he vigorously denies it, it is at least arguable that Lloyd, known for purchasing cigarettes, was as of the time a smoker.

[9]

The medical histories of the representative Plaintiffs are set out in Appendix A hereto.

6

medicine, pulmonary medicine, and critical care, has reviewed what he deemed to be relevant portions of each Plaintiff's medical records and affirms that each suffers from a variety of conditions which Dr. Munzer concludes were either caused or aggravated by exposure to ETS in prison.[10] As for Plaintiffs' future health, Dr. Munzer and James Repace, M.Sc., a consulting health physicist with more than thirty published peer-reviewed articles on ETS, state that exposure to the levels of ETS indicated by Dr. Hammond's report and the 1998 urinalyses has caused Plaintiffs Johnson, Minniefield-El, and Lloyd to incur increased risks of lung cancer, heart disease, respiratory disease, stroke, and heart attacks.[11] Defendants do not argue that Plaintiffs' alleged maladies are illusory. What they do challenge, however, is the sufficiency of Dr. Munzer's basis for contending that Plaintiffs' conditions were caused or aggravated by ETS. Among other things, Defendants point out that the predictions made by Dr. Munzer and Mr. Repace concerning Plaintiffs' future health are based primarily on Dr. Hammond's measurement of airborne nicotine levels which their expert Dr. Moore has shown to be flawed and unreliable.

Plaintiffs also submit that Defendants were aware of the hazards posed by ETS. Defendants make what they contend is an important distinction. While acknowledging the existence of scientific and medical studies indicating a connection between ETS exposure and increased risks

---

[10]

According to Dr. Munzer, McIntyre has asthma and suffered numerous asthma attacks; Johnson has been diagnosed with chronic sinusitis and allergies to smoke and dust and has frequently experienced sinus congestion, headaches, and difficulty breathing; Malcolm has asthma and has suffered numerous asthma attacks; Lloyd has recurrent sinus problems, chronic hypertension, and suffered a heart attack; and Minniefield-El has heart disease with angina and hypertension, and has suffered incidents of unstable angina.

[11]

Repace characterizes as "massive" Minniefield-El's and Lloyd's risks of developing lung cancer and heart disease as a result of their exposure.

7

of lung cancer and heart disease, they insist that, inasmuch as they are not scientists or medical experts, they have been unable to determine whether the increases in risk demonstrated by these studies qualify as significant. Moreover, while some Defendants admit their awareness of a connection between ETS and disease, others state that they are not aware of any proven link between ETS exposure and serious health problems.

Finally, Plaintiffs call attention to numerous complaints and requests for administrative action they have made to prison authorities, including requests for cell changes due to ETS exposure, the majority of which allegedly were not acted upon and none of which resulted in stepped-up efforts by Defendants to enforce the ban on smoking. Defendants counter that Plaintiffs are a particularly litigious group whose complaints have often been frivolous and/or lacking in medical support, and which in several instances have been dismissed because Plaintiffs failed to follow through on them. As for their efforts to enforce the smoking ban, Defendants maintain that they have done their best, pointing out that smoking is only one of many activities inmates are forbidden to engage in -- violent behavior and its control, for example, having a higher enforcement priority.

## II. Standard of Review

A district judge may "designate a magistrate [judge] to conduct hearings, including evidentiary hearings" in order to "submit to a judge of the court proposed findings of fact and recommendations for the disposition . . . of any motion excepted in subparagraph (A)," which includes motions for summary judgment. 28 U.S.C.A. § 636(b)(1)(B) (1993); *see also* Fed. R. Civ. P. 72(b). In reviewing the magistrate judge's report, the court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C.A. §

8

636(b)(1)(C). Any party may object to the magistrate judge's findings and recommendations, and the court is bound to make a "*de novo* determination of those portions of the report . . . or recommendations to which objection is made." *Id.*; *see also Young v. Catoe,* 205 F.3d 750, 754 (4th Cir. 2000).

### III. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue of material fact that could lead a rational trier of fact to find for the non-moving party. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court views all evidence in the light most favorable to the non-moving party and must draw all justifiable inferences in favor of the non-moving party. *See Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir. 1979). A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Only fact disputes capable of affecting the outcome of a case under governing law will preclude summary judgment. *See Anderson*, 477 U.S. at 248.

The moving party has the initial responsibility of demonstrating that there is no genuine issue of material fact and that summary judgment is warranted. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Pulliam Inv. Co., Inc. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987). If the moving party does not bear the burden of proof at trial, and that party demonstrates an absence of evidence to support an essential element of the non-moving party's case, and the non-movant fails to make a sufficient showing in response, the moving party is entitled to summary judgment. *See Celotex Corp.*, 477 U.S. 317. In contrast, when the movant bears the burden of proof at trial, he "must do more than put the issue into genuine doubt; indeed [he] must

9

remove genuine doubt from the issue altogether." *Hoover Color Corp. v. Bayer Corp.*, 199 F.3d 160, 164 (4th Cir. 1999) (quoting *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1425-26 (11th Cir. 1990)). Under those circumstances, summary judgment will not be granted unless the movant's own submissions in support of the motion demonstrate an absence of a genuine dispute as to every fact material to each element of the movant's claim and the non-movant's response fails to raise a genuine issue of material fact as to any one element. *See Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 617-18 (2d Cir. 1998); *National State Bank v. Federal Reserve Bank of New York*, 979 F.2d 1579, 1582 (3d Cir. 1992); *Calderone v. United States*, 799 F.2d 254, 258 (6th Cir. 1986).

## IV. Eighth Amendment Claim

With regard to medical attention due a prisoner, a prison official can violate the Eighth Amendment in two ways. The official can be deliberately indifferent to the prisoner's existing serious medical needs, *see Estelle v. Gamble*, 429 U.S. 97 (1976), or he can be deliberately indifferent to conditions posing a substantial risk of serious future harm. *See Helling v. McKinney,* 509 U.S. 25 (1993). In this litigation, Plaintiffs proceed on both theories.

As to past deliberate indifference to existing serious medical needs, Judge Schulze recommends that the motions of both parties be denied, such that it would remain for Plaintiffs to prove at trial all the elements relative to this claim. As to whether Defendants have created an unreasonable risk to Plaintiffs' future health, Judge Schulze would grant Plaintiffs' motion insofar as they seek a declaration of liability and injunctive relief, but deny it as to damages.

A)    The Court begins with Judge Schulze's recommendations regarding Defendants' alleged deliberate indifference to Plaintiffs' existing serious medical needs.

10

Defendants' primary argument is that they are protected from liability in this regard on the basis of qualified immunity because, in the familiar words of the Supreme Court, their conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *See Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Plaintiffs, not surprisingly, take a contrary position.

The Court agrees with Plaintiffs that a clearly established constitutional right is involved. Since at least June 1993, when the Supreme Court decided *Helling v. McKinney,* Defendants have been on notice that the specific acts with which they are charged, *i.e.* exposing inmates to unhealthy conditions created by second-hand smoke, may give rise to liability under the Eighth Amendment. The problem, however, comes with the second prong of the qualified immunity analysis, *i.e.* whether a reasonable person would have knowledge that what has occurred in Maryland's prisons was unconstitutional. Plaintiffs ask that the Court answer that question in the affirmative as a matter of law; Defendants would have the Court answer the question as a matter of law, but in the negative. The Court agrees with Judge Schulze that, on the present record, neither side is entitled to prevail. Accordingly, the Court adopts -- with one slight modification -- Judge Schulze's recommendation regarding the parties' respective requests for relief as to past indifference. For the sake of convenient reference, her recommendations are set out as follows:[12]

"Plaintiffs also claim that they have specific medical conditions which have been caused or aggravated by ETS, and that Defendants were deliberately indifferent to each Plaintiff's

---

12

The footnotes in Judge Schulze's report have been renumbered to conform to the sequence in this Opinion.

serious medical needs when they failed to enforce the smoking policies and/or failed to act in

response to medical orders to reduce the ETS to which particular Plaintiffs were exposed. To sustain

an Eighth Amendment medical care claim, a prisoner must show deliberate indifference to serious

medical need. *See Estelle*, 429 U.S. at 104-05; *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir.

1996). A two-step inquiry is required: The medical need, assessed objectively, must be sufficiently

serious to require medical treatment, and the Defendants must be subjectively aware of that need and

of its seriousness and nevertheless act with deliberate indifference to it. *See Farmer v. Brennan*, 511

U.S. 825, 837 (1994); *Brice v. Virginia Beach Correctional Ctr.*, 58 F.3d 101, 104 (4th Cir. 1995).

To sustain a claim that exposure to ETS aggravated a current medical condition, the inmate must

produce competent evidence of that medical condition. *See Henderson v. Sheahan*, 196 F.3d 839,

846 (7th Cir. 1999); *Jackson v. Berge*, 864 F. Supp. 873, 881-82 (E.D. Wis. 1994). Inadvertent or

negligent failure to provide treatment will not suffice. *See Estelle*, 429 U.S. at 106.

"Plaintiffs have shown that they have the medical conditions they allege and

[arguably][13] that those conditions were aggravated by ETS. However, again due to the consolidation

of the cases, the parties have not briefed the questions whether each Plaintiff's medical condition

was sufficiently serious to require action, or whether these Defendants, either personally or in an

supervisory capacity,[14] were subjectively aware of Plaintiffs' conditions and of their seriousness.

---

13

Insertion of the word "arguably" is the Court's "slight modification" to this portion
of Judge Schulze's Report and Recommendation. As discussed *infra*, the Court does not find that
Plaintiffs have established as a matter of law a causal link between their medical conditions and ETS.

14

"Supervisory officials may be held liable in certain circumstances for the
constitutional injuries inflicted by their subordinates." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.
1994). For liability to attach on the basis of improper supervision, a plaintiff must show that (1) the

Similarly unaddressed are whether these Defendants are responsible for the responses Plaintiffs received to their complaints about ETS, and whether those responses amount to deliberate indifference.

"Plaintiffs have a wide range of medical conditions; not only do their conditions vary in degrees of seriousness and susceptibility to ETS, but so does any notice to Defendants in that regard. Further, Plaintiffs submitted a widely varying range of complaints, some of which referenced their medical conditions and some of which did not, and Defendants' responses to these complaints varied widely. For example, when Plaintiffs complained that they were housed with smokers, some received housing changes and some did not, and there is little or no evidence as to how long it took to make changes or why other changes were denied. Similarly unaddressed are questions concerning what, if any, contribution Plaintiffs' own actions made to their past exposure to ETS.[15] Until these matters are addressed, summary judgment for either party on this issue would be inappropriate."

To this, the Court would add its own observation that Defendants have no better claim to summary judgment on this issue than do Plaintiffs. As discussed *infra*, whereas a generalized risk of future harm may reasonably and perhaps only be addressed by implementation of an anti-smoking

_____

defendant had actual or constructive knowledge that the subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury; (2) the defendant's response was so inadequate as to demonstrate deliberate indifference or tacit authorization of the alleged offensive practices, and (3) an affirmative causal link existed between the defendant supervisor's inaction and the injury sustained by the plaintiff. *See Shaw*, 13 F.3d at 799 (citations omitted).

15

For example, some Plaintiffs used tobacco products as currency. (Def. Ex. 18, at 68, 72; Def. Ex. 23, at 121, 129; Def. Ex. 43, at 105). Other Plaintiffs burned incense, at times requested to be housed with persons who smoked, and assisted inmates who were charged with violating the smoking ban.

policy, existing serious medical needs are susceptible to and may reasonably require more specific action. By way of illustration, a prison official presented with a doctor's note indisputably diagnosing an inmate with a heart condition and recommending that he be provided with a nonsmoking cellmate could not reasonably ignore the recommendation in reliance on an anti-smoking policy. On the other hand, the same official presented with evidence that ETS exposure can cause future health problems might quite possibly be able to rely on little else. By the same token, whereas a reasonable person might not know that he has created an unconstitutional risk to inmates' future health once a nonsmoking policy has been put in place, that same person might just as reasonably be expected to know that his disregard of the existing serious medical needs of a given inmate was unconstitutional. Hence, as discussed *infra*, qualified immunity could be found to apply in the former situation, but not in the latter.

B)    The Court next considers Judge Schulze's recommendations regarding Defendants' alleged deliberate indifference to conditions posing a substantial risk of serious future harm.

1)    In *Helling*, 509 U.S. 25, the Supreme Court addressed this issue in the context of prisoners and ETS conditions. The Court held that an inmate states a cause of action under the Eighth Amendment by alleging that prison officials, with deliberate indifference, have exposed him to levels of ETS that pose an unreasonable risk of serious damage to his future health. *Helling*, 509 U.S. at 35. Such a claim involves both objective and subjective components. The objective factor requires that the inmate prove "that he himself is being exposed to unreasonably high levels of ETS," and that the risk he complains of is "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Id.* at 36. The subjective factor

14

requires proof that Defendants acted "with deliberate indifference" to Plaintiffs' serious medical needs. *Id.*

Judge Schulze believes that Plaintiffs have met their burden on the objective prong. She finds that Plaintiffs' expert testimony establishes that in fact they are being exposed to unreasonably high levels of ETS and that exposure at these levels is highly likely to cause serious damage to their future health. She also finds that this exposure poses risks that today's society chooses not to tolerate because, although "there may be no universal accepted tolerance level for ETS, the State of Maryland has concluded that there is no acceptable tolerance level for indoor ETS, and has accordingly prohibited smoking in all State buildings." As to the Defendants' deliberate indifference, the other component of the objective prong, Judge Schulze concedes that while their past indifference may be debatable, once it is established that Maryland's prisons tolerate unreasonable levels of ETS, any failure by Defendants to protect Plaintiffs from the effects of ETS thereafter would constitute the requisite deliberate indifference. Accordingly she would grant Plaintiffs injunctive relief and give the State sixty (60) days to submit a remedial plan for Court approval. She proposes leaving the details of the plan to the State's discretion, so long as it contains a mechanism for monitoring ETS levels and for proper remediation if the "unconstitutional conditions [recur]." As for money damages based on future risk, Judge Schulze finds as a matter of fact that Defendants have not been deliberately indifferent to Plaintiffs' rights heretofore and that, in any event, as a matter of law Defendants are entitled to qualified immunity.

Defendants object to the conclusion that Plaintiffs have established that they have been exposed to unreasonable levels of ETS likely to put them at risk as to their future health. They argue that not only is summary judgment in favor of Plaintiffs with regard to liability and

15

injunctive relief inappropriate; they themselves, they say, are entitled to summary judgment. This is so, they contend, because Plaintiffs' so-called scientific evidence is neither reliable, compelling, nor unrebutted and because in fact they have not been deliberately indifferent to the effects of ETS.

Plaintiffs object to that portion of Judge Schulze's recommendation that would grant summary judgment to Defendants as to damages for risks to Plaintiffs' future health.

2)    Bearing in mind that Plaintiffs have the burden of proof on the unreasonable risk to future health claim, they are not entitled to summary judgment unless they can "remove genuine doubt" as to every element of that claim. *Hoover*, 199 F.3d at 164 (*quoting Alan's of Atlanta, Inc.*, 903 F.2d at 1425-26). Defendants, in contrast, need only raise a genuine issue of material fact as to any one element in order to defeat summary judgment. *See Albee v. Tomato Inc.*, 155 F.3d at 617-18. Indeed, even if Defendants come forward with no evidence at all, summary judgment in favor of Plaintiffs may still be inappropriate if their evidence is "too scanty to justify rendering judgment" in their favor. WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 2739 at 396 (1998) (citing *Williams v. Chick*, 373 F.2d 330 (8th Cir. 1967)).

3)    Having reviewed the record, the Court concludes that Plaintiffs have not removed all genuine doubt on the issue of whether they are being or have been exposed to levels of ETS that would put them at risk for future serious illness. In the first place, the very proposition that all Maryland's prisons are conclusively in this posture is highly suspect. Unquestionably a state-wide ban on indoor smoking in the State's prisons has been in effect since 1995. But inasmuch as multiple Plaintiffs housed in different institutions at different times are pressing claims of unduly high levels of ETS, as well as claims that such levels have caused or are likely to cause or aggravate medical conditions, and further claims that nonsmoking policies have been underenforced, one

16

approaches with skepticism the suggestion that a single conclusion about ETS applies to Maryland's prisons across the board.

Plaintiffs' evidence with respect to the levels of ETS in Maryland prisons consists entirely of Dr. Hammond's report, the 1998 urinalyses, and affidavits from certain inmates and correctional officers. But as for the Hammond report, Dr. Moore has raised what the Court believes are legitimate questions of methodology which may well lead a trier of fact to conclude, as did Dr. Moore, that "the long-term exposure to ETS experienced by these three prisoners could have been substantially lower than reported." There are legitimate grounds for debate over whether the period of Dr. Hammond's test was too restricted, whether her sample was too limited,[16] whether she adequately supervised the placement of the monitors, and whether she failed to use control monitors or to assess measurement error. A trier of fact might well find that one or more of these considerations undermine the reliability of her report. Particularly open to challenge, in the Court's view, is the apparent lack of any measures to counter efforts by inmates to tamper with the monitors concentrated in their smoking vicinity.[17] Dr. Hammond herself has characterized the practice of placing a single monitor in an inmate's cell as posing a "high-risk" of tampering because, in her

---

16

At her deposition, Dr. Hammond testified that in office workplace studies of ETS she generally recommends using at least ten nicotine monitors in each workplace. Here a total of nine monitors were disbursed over three prisons and only seven finally retrieved. When asked whether she would be able to draw conclusions about the level of smoke at a facility the size of RCI based on results from the three monitors placed there, Dr. Hammond testified that she would not.

17

Judge Schulze points out that efforts to tamper with the monitor in this way, if successful, would only serve to prove that the ban is ineffective. However, even Defendants do not contend that the ban is completely effective. The issue in play is different, *viz.* whether the nicotine levels measured by Dr. Hammond accurately reflect actual conditions in the prisons.

17

words, "some people might say [the inmate] had some investment in their [sic] being a high level

there or something." She has also testified that for this very reason in a previous study she placed

multiple monitors in each tested cell. In the present case, however, three of the seven monitors

whose readings underpin Dr. Hammond's report[18] were placed singly in cells inhabited by three of

the Plaintiffs. Not insignificantly perhaps -- it can be left to the trier of fact to judge -- the nicotine

concentration levels recorded by two of these three monitors turned out to be more than three times

as high as the next highest level recorded.

      Plaintiffs, to be sure, have cited other evidence of the ETS levels in Maryland

prisons – the 1998 urinalysis results and affidavits from prisoners and correctional officers. But

Defendants have cited the urinalyses of Plaintiffs conducted in the Spring of 1995, before the

complete ban on indoor smoking went into effect. These tests detected nicotine or cotinine in only

two of the six samples tested. Additionally, several Defendants have testified that they personally

have encountered little evidence of ETS in their prisons and have received relatively few complaints

about it. While Plaintiffs object that the 1995 tests were not designed to detect exposure to ETS,

arguing that Defendants' affidavits and testimony regarding ETS levels are less valuable than those

of the prisoners and correctional officers "who spend far more time in the housing units than do the

wardens," this argument hardly conduces to summary judgment in Plaintiffs' favor. Dr. Hammond

herself says of the type of testing done on the 1995 samples that, while it is "not my first choice of

what to do" and that "mostly it's been used in general to distinguish smoking from nonsmoking,"

---

18

   Again, although nine monitors were placed, only seven were recovered. This
provides a further possible basis on which to challenge the reliability of Dr. Hammond's
measurements.

it is true that "some of my colleagues have wanted to do [such a test]." Such testimony in no way

establishes that the 1995 tests are irrelevant or unreliable. On the contrary, by implication, if such

tests would not be Dr. Hammond's "first choice," they may well be her second or third. Moreover,

tests that are "mostly" used to distinguish smokers from nonsmokers do not *ipso facto* become

irrelevant indicators of ETS exposure. Dr. Hammond admits that several of her colleagues use those

tests for precisely that purpose. Finally, assuming Plaintiffs are correct that the testimony of their

witnesses is entitled to "more weight" than that of Defendants, they pose what is quintessentially a

question for the jury, not one for the Court on a motion for summary judgment.

With respect to the causal connection between ETS exposure and Plaintiffs'

future health, Plaintiffs again fail to make the case for judgment as a matter of law. Both of their

experts' predictions are based on the assumption that Plaintiffs are being exposed to ETS at the

levels measured by Dr. Hammond and the 1998 urinalyses. As just noted, however, questions

remain regarding the actual levels of ETS in Maryland prisons; hence the validity of any alleged

causal connection also remains open to dispute. Further, as for the effect of ETS exposure on their

past health, Plaintiffs rely exclusively on Dr. Munzer's opinion, based on what might be challenged

as a too cursory review of Plaintiffs' medical records,[19] that Plaintiffs symptoms "were caused or

aggravated by ETS." At his deposition, Dr. Munzer backed away somewhat from this assertion,

conceding that Plaintiffs' heart conditions, asthma, headaches, hypertension, and sinus problems

---

19

At his deposition, Dr. Munzer testified that he had not read each Plaintiff's entire medical record, but instead merely turned to the portions tabbed by Plaintiffs' counsel in order "to verify that they had conditions that I know are aggravated by environmental tobacco smoke." He apparently did not determine whether the people who examined Plaintiffs had recorded any diagnosis of the cause of their complaints. He also made no notes of his review.

19

could have been caused by other factors. Additionally, Dr. Munzer was unable to quantify the extent to which exposure to ETS would aggravate any of Plaintiffs' various maladies. While this, of course, does not invalidate his testimony, that is not the point. Plaintiffs are asking for judgment as a matter of law as to causation. Dr. Munzer's opinion may be sufficient to ward off summary judgment in favor of Defendants on this issue -- if only barely, *see Scott v. District of Columbia,* 139 F.3d 940, 943 (D.C.Cir. 1998) -- but it is by no means compelling enough to support a grant of summary judgment in Plaintiffs' favor.

Finally, since the Court concludes that issues of fact remain as to the actual levels of ETS in Maryland prisons, it follows that it cannot yet be determined whether "it is contrary to current standards of decency for anyone to be so exposed against his will." *Helling*, 509 U.S. at 35.[20] The Court notes, however, that the relevant question is not whether current standards of decency allow society to expose prisoners, specifically, to ETS against their will, but rather whether these standards allow "anyone" to be so exposed. *Id.* at 36 (court must "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk") (emphasis added). Defendants' contention that "because there is no national consensus about prisons and ETS, there has been no violation of standards of decency," and that "the purpose of this inquiry . . . is to determine only whether society has rejected exposing inmates to ETS" may be stretching the point too far. But the

20

It is clear that society has not yet condemned involuntary exposure to ETS at all levels. *See Simmons v. Sager*, 964 F. Supp. 210, 213 (W.D. Va. 1997). It is equally clear, however, that at some level non-consensual exposure to ETS violates contemporary standards of decency. *See McKinney v. Anderson*, 924 F.2d 1500, 1508-09 (9th Cir. 1990), *vacated on other grounds by Helling v. McKinney*, 502 U.S. 903 (1991). Plaintiffs' burden at trial will be to establish that they have been exposed to ETS at levels that society has proven unwilling to impose on unwilling non-smokers.

Court agrees with Defendants that current standards of decency must be measured by evidence from the nation as a whole, not merely by what the Maryland legislature has done. *See Sanford v. Kentucky*, 492 U.S. 361, 370-71 (1989) (punishment violates contemporary standards of decency when state legislatures have reached a sufficient degree of national consensus in rejecting it); *Penry v. Lynaugh*, 492 U.S. 302, 331 (1989) (in determining whether conduct comports with contemporary standards of decency, "[t]he clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures"); *Rhodes v. Chapman*, 452 U.S. 337, 346-47 (1981) ("objective indicia" of contemporary standards of decency to which courts should look are "history, the action of state legislatures, and the sentencing by juries" as well as basic background facts about the relation between inmates and prison authorities).[21]

In view of the foregoing, the Court holds that Plaintiffs have not conclusively satisfied the objective prong of *Helling*. It will remain for the trier of fact to determine as to each institution in the state system as to which a claim is made whether there has been unreasonable exposure to unreasonably high levels of ETS creating a risk so grave that it violates contemporary standards of decency to expose anyone to such a risk.

4) As to the subjective prong of the claim that Defendants have created an unreasonable risk to Plaintiffs' future health, Judge Schulze distinguishes between damages

---

21

This is not to say that a condition of confinement violates contemporary standards of decency only if the nation's legislatures have generally agreed to repudiate it. As the Supreme Court has made clear, "legislative judgments alone cannot be determinative of Eighth Amendment standards since that Amendment was intended to safeguard individuals from the abuse of legislative power." *Gregg v. Georgia*, 428 U.S. 153, 174 n.19 (1976) (opinion of Stewart, Powell, Stevens, JJ.). Thus, in the absence of a clear and unequivocal legislative judgment, courts are required to look to other objective factors. *See id.* at 182.

liability and injunctive relief. She concludes that the claim for damages fails because, as a matter

of law, Defendants have not been shown to be indifferent in the past and because, in any event, they

are protected by qualified immunity as to the claim.   Injunctive relief, on the other hand, she

believes proper because Defendants' past deliberate indifference is irrelevant to that relief, *i.e.*, once

the objective factor under the Eighth Amendment is established -- that there are unreasonable levels

of ETS posing a substantial risk to future health -- disregard of that reality by Defendants in the

future would amount to deliberate indifference on their part.

        The Court agrees with Judge Schulze's recommendation as to future damages

(though its reasons differ slightly), but disagrees with regard to injunctive relief.

        First a word about qualified immunity.   Although the doctrine is an

affirmative defense to damage liability, it does not bar an action for declaratory or injunctive relief.

*See Harlow,* 457 U.S. at 806; *Wood v. Strickland*, 420 U.S. 308, 315 n.6 (1975) ("[I]mmunity from

damages does not ordinarily bar equitable relief as well"); *American Fire, Theft & Collision

Managers, Inc. v. Gillespie*, 932 F.2d 816, 818 (9th Cir. 1991).   Thus, insofar as damages are

concerned, the Court asks the usual two questions applicable under the doctrine:

> i)      Did the actions of Defendants violate a clearly established
>
>           constitutional standard?
>
> ii)     Would a reasonable person have known that his actions
>
>           violated those norms?

        As already stated, the Court finds that, since *Helling v. McKinney* in 1993, the

right of a prisoner to be free from unreasonable levels of ETS has been clearly established. But as

the Supreme Court itself noted in *Helling*, a policy restricting smoking in certain areas and directing

22

prison officials to make reasonable efforts to avoid putting smokers and non-smokers in the same cell may make it impossible to show exposure to a risk to future health violation under the Eighth Amendment. *See* 509 U.S. at 36. Given that proposition, the question becomes whether, on the present record, Defendants could have been expected to know that their initial nonsmoking policy of 1992 and their more expanded policy of 1995 nevertheless created an unconstitutional condition. As Judge Schulze notes, the fact that Defendants might have known that there were problems with the enforcement of their policies does not necessarily mean that they also knew that they were violating Plaintiffs' rights under the Eighth Amendment. *See Scott*, 139 F.3d at 944. As a matter of fact, Defendants deny that they knew they were violating Plaintiffs' rights under the Constitution. But apart from that, the Court concludes as a matter of law that a reasonable person situated similarly to Defendants would not have known that his conduct was unconstitutional. The Court thus agrees with Judge Schulze that Defendants are entitled to qualified immunity against any claim for damages for Plaintiffs' exposure of levels of ETS which may hereafter be found to create an unreasonable risk to their future health.

Injunctive relief stands on a different footing. Since the doctrine of qualified immunity has no application in that context, the issue is simply whether an unconstitutional condition currently exists. If it does, a district court is authorized to order remediation. *See Taylor v. Freeman*, 34 F.3d 266 (4th Cir. 1994). To that extent, the Court agrees with Judge Schulze. However, since the Court, in contrast with Judge Schulze, does not conclude as a matter of law that unconstitutional conditions exist in Maryland prisons *vis-à-vis* ETS, any remediation of the situation must necessarily await resolution of that issue. In short, no injunctive relief will be ordered as of this time.

23

## V. **ADA and Rehabilitation Act Claims**

Plaintiffs also maintain that their exposure to ETS gives rise to claims under the ADA and the Rehabilitation Act. Judge Schulze recommends denial of both sides' motions with regard to liability under the Acts, but on the basis of qualified immunity recommends that the Court grant Defendants' motion as to damages. Plaintiffs argue that, while summary judgment in favor of all Plaintiffs may not be appropriate on this claim, "undisputed evidence" justifies a finding that at least Plaintiffs Malcolm and Minniefield-El are entitled to declaratory relief as to liability and entitlement to damages in an amount to be proved later. They also argue that Malcolm is entitled to injunctive relief, conceding that any claim for such relief by Minniefield-El is moot by reason of his release from custody.

The Court agrees with Judge Schulze's recommendations in part and disagrees in part.

There is no longer any question after *Pennsylvania Department of Corrections v. Yeskey,* 524 U.S. 206 (1998) that Title II of the ADA and by extension the Rehabilitation Act apply to inmates or prisons. Despite a few lingering issues raised in *Yeskey*, the Court is satisfied that it is appropriate to go forward with an analysis of Plaintiffs' claims under the Acts. Because the language and purposes of the Acts are substantially the same, a common analysis applies to claims brought under them. *See Doe v. University of Maryland Medical System Corp.*, 50 F.3d 1261, 1264 n.9 (4th Cir. 1995). Accordingly, in the context of a claimed denial of a benefit, to establish a violation of either statute, a plaintiff must prove that he or she:

      1)     is a "qualified individual with a disability";

      2)     is otherwise qualified for the benefit of programs, services, or activities in question; and

3)        was excluded from the same due to discrimination on account of the
disability.

*See* 42 U.S.C. § 12132; 29 U.S.C. § 794; *Doe*, 50 F.3d at 1265; *see also Layton v. Elder*, 143 F.3d

469, 472 (8th Cir. 1998).

Plaintiff Malcolm has submitted evidence that he suffers from asthma attacks[22] and

Minniefield-El has shown that he has heart disease and hypertension that limit his activities. Such

evidence alone, however, does not establish that either Plaintiff is a qualified individual with a

disability within the meaning of the respective Acts, nor does it establish that the condition of either

Plaintiff meets the required level of severity. For example, as recently observed by Judge Harvey

of this Court in *Tangires v. The Johns Hopkins Hospital*:

> The requirement in an ADA case that an individualized analysis should be
> made is particularly appropriate in the context of a disability claim based on
> asthma. The severity of asthma varies a great deal from person to person, and
> the frequency with which a person experiences asthmatic episodes also varies
> greatly. With proper treatment asthmatic systems can almost always be
> controlled.

79 F. Supp. 2d 587, 594-95 (D.Md. 2000) (citations omitted).

---

[22]

Aside from his own layman's opinion that his asthma attacks were caused by ETS
exposure, Malcolm points only to Dr. Munzer's opinion that these attacks "were caused or
aggravated by ETS." The basis for Dr. Munzer's opinion is no more than this: that Malcolm's
medical records reveal that he has had asthma attacks while in prison; that Dr. Hammond's report
and the 1998 urinalyses indicate that there are significant levels of ETS in Maryland prisons; and that
Dr. Munzer has independent, expert knowledge that exposure to ETS can cause asthma attacks. As
Dr. Munzer conceded at his deposition, however, asthma attacks may be precipitated not only by
ETS but by a variety of other factors. In addition, Dr. Munzer's opinion is based on his uncritical
acceptance of Plaintiffs' evidence regarding the levels of ETS in Maryland prisons, and fails to
account either for the deficiencies in Dr. Hammond's sampling methodology pointed out by Dr.
Moore, or Defendants' contradictory evidence on this point.

Indeed, as Judge Harvey noted in *Tangires*, based on the Supreme Court's ruling in *Murphy v. United Parcel Service*, 527 U.S. 516 (1999), the determination of a plaintiff's disability must be made with reference to the mitigating measures which the plaintiff employs. *See* 79 F. Supp. 2d at 595. Further, as Judge Schulze notes, the extent to which any Plaintiff in this case has actually been "excluded" from a prison system service, program or activity, is by no means clear. Nor is it obvious that such an exclusion, if it occurred at all, was necessarily on account of a disability. The Court finds no basis upon which to grant Plaintiffs summary judgment on the liability component of their ADA and Rehabilitation Act claims.

At the same time, as Plaintiffs themselves note, Defendants are entitled to prove, as to each institution claimed to be in violation, that they cannot reasonably accommodate Defendants' demands, *i.e.* that a fundamental alteration or undue burden would ensue from permitting individuals with disabilities otherwise eligible to benefit from a particular service, program or activity to participate in them. *See Juvelis v. Snider*, 68 F.3d 648, 653 n.5 (3rd Cir. 1995); *Barth v. Gelb*, 2 F.3d 1180, 1187 (D.C.Cir. 1993). That issue, too, remains more suitable for resolution by the trier of fact.

Defendants seem to be contending that qualified immunity shields them from liability under the Acts now and into the indefinite future. The Court disagrees. Defendants are shielded by the doctrine, but only up to a point, *i.e.* until the Supreme Court's decision in *Yeskey* on June 15, 1998, holding that the ADA applies to prisoners. *See also Torcasio v. Murray,* 57 F.3d 1340 (4th Cir. 1995). From that point forward, taking into account that *Helling* was decided in 1993, it has to be said that there was a clearly established constitutional right of prisoners to be free from unreasonable levels of ETS and, to the extent that a prisoner might otherwise qualify under the ADA, that the prisoner would be entitled to damages for the prison's failure to provide reasonable accommodation

for his disability. Accordingly, the question of Defendants' liability under the Acts since June 15, 1998 remains an open one.

Plaintiffs' entitlement to damages is another matter. Qualified immunity does protect Defendants, at least up until the *Yeskey* decision in June, 1998. But after that, just with liability under the Acts, qualified immunity against damages comes to an end. Assuming a Plaintiff is able to establish the elements of an ADA claim against any institution that housed him or her, damages would be recoverable from June, 1998 forward.

Finally, there is the matter of injunctive relief under the Acts as to which, again, no qualified immunity exists. Judge Schulze has suggested that any injunctive relief that might be granted in connection with Plaintiff's Eighth Amendment claims would essentially encompass injunctive relief under the Acts. Assuming that to be so, the Court would note that entitlement to injunctive relief under the ADA and Rehabilitation Acts may in fact be easier to establish than under the Eighth Amendment. Under the Acts, for example, Plaintiffs would not be required to prove, as they would in connection with their Eighth Amendment claims, that the conditions they have been exposed to violate a contemporary standard of decency.

## VI. Conclusion

Summing up:

1) With regard to Plaintiffs' Eighth Amendment claim of deliberate indifference to existing medical needs, neither side is entitled to summary judgment. Each Plaintiff must prove that he or she had or has a medical need, assessed objectively, that was or is sufficiently serious to require medical treatment and that each Defendant at each institution as to which a claim is made

27

was subjectively aware of that need and its seriousness and nevertheless acted with deliberate indifference to it.

2) As to the Eighth Amendment claim that Defendants are liable for damages for exposing Plaintiffs to substantial risks of serious future harm, Defendants are entitled to summary judgment.

3) As to the same claim in #2, in order to prove their entitlement to declaratory or injunctive relief:

a) Each Plaintiff must prove as to each Defendant as to each institution against which a claim is made that unreasonable levels of ETS exist at that institution;

b) that he himself or she herself is being exposed to those levels; and that

c) the risk generated by those levels is so grave that it violates contemporary standards of decency to expose anyone to it.

4) With regard to the ADA/Rehabilitation Act claims, for the period beginning June 15, 1988 to the present, each Plaintiff must prove as to each institution against which a claim is made that:

a) he or she is a qualified individual with a disability;

b) he or she is otherwise qualified for the benefit of service, program or activity in question; and that

c) he or she was excluded from the service, program or activity, due to discrimination on the basis of the disability.

28

5)  With regard to all claims, Defendants may prove, as to a given institution, that

a given Plaintiff's demands could not or cannot reasonably be accommodated.

6)  Expressing these various rulings in terms of the pending motions, the Court will

DENY Plaintiffs' Motion for Summary Judgment and GRANT IN PART and DENY IN PART

Defendants' Supplemental Motion to Dismiss or in the Alternative for Summary Judgment.[23]

---

23

There remains the task of getting this case in shape for trial.  In the Court's view, it remains far from ready.  Considerable further winnowing can be accomplished.  The Court therefore proposes the following plan, which it invites counsel to comment upon:

For each Plaintiff in these cases (as well as each Plaintiff in the several stayed cases) counsel should set forth in summary fashion, preferably in tabular form, what that Plaintiff's serious medical condition is or was; how the condition is or was in fact aggravated by ETS; where, when, and to whom complaints have been made; what responses, if any, were given, when and by whom; and how that response or lack of response aggravated the serious medical condition of the Plaintiff.

As to the ADA/Rehabilitation Act claims, it should be shown as to each Plaintiff, with citation to appropriate case authority, why his or her condition renders him or her a qualified individual within the meaning of the Acts; specifically what service, program or activities since June 15, 1998 the Plaintiff has been denied in each institution against which the Plaintiff is making a claim, on what basis the claim is made that the Plaintiff was denied each such service, program, or activity by reason of his or her disability, what accommodation was requested in connection therewith, and when and of whom; and what accommodation, if any, was given in response, and when and by whom.

Thereafter by appropriate motion, Defendants may present arguments in favor of summary judgment on one or more issues as to one or more Plaintiffs.

Proceeding in this fashion, the Court will be able to determine, as a preliminary matter, whether a given Plaintiff has an existing medical condition that is sufficiently serious and whether there has been a *prima facie* showing of deliberate indifference to such condition on the part of one or more Defendants.  Similarly, it can be determined preliminarily whether a given Plaintiff is a qualified individual within the meaning of the ADA/Rehabilitation Act; precisely what services, programs, or activities have been denied him or her, and when and by whom; whether it can be fairly argued similarly that what a given Defendant did or did not do was on account of Plaintiff's disability and whether reasonable accommodation could have been or can be given as to that Plaintiff.

A separate Order will be ENTERED implementing this Opinion.

November 21, 2000

/s/ Peter J. Messitte
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

---

The Court asks that counsel consult with one another and submit written responses to this proposal to the Court within the next 20 days. Thereafter the Court will arrange a status conference with counsel to discuss whether this proposal or some variation of it should be put in place.

3. **Recommended Findings of Fact**.

    A. **Plaintiffs.**

        1. Steven M. Johnson.

Mr. Johnson has been incarcerated at the Maryland House of Correction (MHC) since February 1999.[24] He has also been incarcerated at various times pertinent to this motion at the Western Correctional Institution (WCI), the Maryland Correctional Institution - Hagerstown (MCIH), Roxbury Correctional Institution (RCI), the Maryland Correctional Institution - Jessup (MCIJ), and Eastern Correctional Institution (ECI). (Pl. Ex. 1).

Mr. Johnson alleges that he has chronic allergies to smoke and dust, as well as other health problems. He alleges that exposure to smoke causes him to experience difficulty breathing, severe headaches, sinus congestion, and itchy, watery eyes, and that he is exposed to second hand smoke in his cell and in the day rooms and other prison areas. Id.

In 1988, Mr. Johnson made several requests for a humidifier due to smoke, pollen, and poor ventilation. These requests were investigated and denied. In 1990, he requested a housing change, alleging that the smoke in his dormitory caused him to have problems breathing. When this request was denied for lack of medical documentation, he obtained a note from a physician's assistant stating that he should be transferred to another housing unit because of his allergies to smoke and dust. He was moved to another cell but was not happy with the location for reasons other than air quality. (Pl. Ex. 1B at 10).

---

[24] All information regarding Plaintiffs' recent incarceration was provided at the hearing.

In 1991, Mr. Johnson began complaining about the lack of enforcement of dining room smoking restrictions. In response, Warden William L. Smith reminded correctional officers to enforce the restrictions. Mr. Johnson subsequently complained to Commissioner of Corrections Richard Lanham about the lack of enforcement, and Commissioner Lanham ordered the warden to demonstrate that measures had been taken to ensure enforcement. Signs prohibiting smoking were placed in the dining room and staff were reminded to enforce the prohibition. On May 24, 1994, an administrative law judge denied Mr. Johnson's grievance about non-enforcement of the dining room prohibition, finding that since Mr. Johnson did not identify any inmates who were violating the policy, he had failed to show a violation of applicable regulations. (Pl. Ex. 1B at 26-29).

Mr. Johnson was transferred to ECI, and again requested a nonsmoking cellmate. On October 14, 1994, the Chief Physician's Assistant at ECI wrote a memorandum to Mr. Johnson's housing unit requesting that Mr. Johnson be "housed with a non-smoking cell inmate [sic] provided that Steven Johnson doesn't smoke." (Pl. Exs. 1A, 1B). Mr. Johnson then began requesting a transfer to MCIH where "no smoking" tiers had been established. By early 1995, Mr. Johnson began complaining about ECI's violations of the smoking policies.

Mr. Johnson attests that the amount of ETS varies from one institution to another since an indoor smoking ban went into effect in July 1995. At WCI, the ETS is "not too bad" in the cells but is present in the recreation hall; he did not have problems with smoking cellmates and was permitted to select his cellmates. (Def. Ex. 18 at 60-61, 68). He also was permitted to select his cellmate at MCIJ in 1997. (Def. Ex. 22). In late 1997 and early 1998, Mr. Johnson's requests for an air filter for his cell at WCI were denied and his complaints about being housed with a smoking cellmate and smoking in the day room were dismissed. (Pl. Ex. 1B at 53-58).

32

Alfred Munzer, M.D., a physician who specializes in internal medicine, pulmonary medicine, and critical care, submitted an affidavit which states that he has reviewed Mr. Johnson's medical records. He states that these records reveal that Mr. Johnson has been diagnosed with chronic sinusitis and allergies to smoke and dust, and has, during his incarceration, frequently had sinus congestion, difficulty breathing, and headaches. In Dr. Munzer's opinion, these symptoms were caused or aggravated by ETS, and a prisoner who is allergic to tobacco smoke is likely to experience severe chest tightness, burning of the eyes and throat, long-term lung damage, and an increased risk of lung cancer from exposure to ETS. He also opines that the ETS to which Mr. Johnson has been exposed during his incarceration has caused him to be at significantly increased risk of heart disease and/or stroke. (Pl. Ex. 51). James Repace, a health physicist who has studied ETS, found that, based on urine test and nicotine monitor results, Mr. Johnson has a higher risk of heart disease and lung cancer than that which generally prompts U.S. federal regulatory action. (Pl. Ex. 52).

2. Winston Lloyd.

Mr. Lloyd is presently incarcerated at the Jessup Pre-Release Unit (JPRU), and has also been incarcerated at ECI, RCI, MHC, Brockbridge Correctional Facility (BCF), the Maryland Correctional Training Center (MCTC) and Poplar Hill Pre-Release Unit (PHPRU). He alleges that he has sinus problems, heart disease, and high blood pressure, and suffered a heart attack in 1989. He alleges that ETS aggravates his sinus problems and that he has been exposed to ETS in the cells and day rooms at every institution in which he has been housed. (Pl. Ex. 2).

Mr. Lloyd filed a complaint about ETS at MCTC in 1991, which led to an inspection or repair of the roof ventilators. In 1992 and 1993, his complaints about smoke in the institutions were dismissed because smoking was permitted at that time. In 1996, at PHPRC, and in 1997, at ECI, he

33

complained several times about non-enforcement of the smoking ban and being housed with smoking cellmates; when he received a response, it generally noted that no specific instances of violation of the ban had been cited. (Pl. Ex. 2A). Affidavits from inmates who have been housed with Mr. Lloyd state that he was often paired with a smoking cellmate. (Pl. Exs. 20, 22, 23, 27, 28, 33). A urine test performed on Mr. Lloyd in September 1998, indicated that his exposure to ETS was very high relative to passively exposed non-smokers, but less than that seen in active smokers. (Pl. Ex. 57).

Mr. Lloyd is aware that inmates have received institutional infraction notices and penalties for smoking; he has advised such inmates to plead addiction as a defense. (Def. Ex. 23 at 39, 41). He burns incense in his cell, which "smoke[s] the cell up." Id. at 126-27.

Dr. Munzer's affidavit indicates that he has reviewed Mr. Lloyd's medical records, which reveal that he had a heart attack in 1989, has hypertension and sinus problems, and that during his incarceration he has had recurrent sinus problems, chronic hypertension, and a heart attack. Dr. Munzer opines that these symptoms were caused or aggravated by ETS, and that a prisoner with sinus problems is likely to experience increased difficulty breathing as a result of ETS. (Pl. Ex. 51). Mr. Repace states that, based on urine test and nicotine monitor results, Mr. Lloyd has a massive risk of developing lung cancer and heart disease. (Pl. Ex. 52).

34

### 3. Carole Ann McIntyre.

Ms. McIntyre was incarcerated at the Maryland Correctional Institution for Women (MCI-W) from August 1994 to August 1995. (Pl. Ex. 4). She alleges that she has had bronchial asthma for twenty years. Between 1990 and early 1994, she received "911" emergency medical treatment for asthma attacks about ten times. She does not know what triggered these attacks, and has not received emergency treatment for asthma since her release from prison. (Def. Ex. 33 at 40-42).

Ms. McIntyre alleges that her asthma is aggravated by tobacco smoke, which makes it difficult for her to breathe and causes asthma attacks. She states that she was housed with smoking cellmates at MCI-W, was exposed to smoke in the recreation room, and had frequent asthma attacks while at MCI-W. (Pl. Ex. 4). She visited the institutional infirmary for asthma attacks during her incarceration. (Def. Ex. 33 at 108-09, 132-33). On a May 2, 1995, sick call slip, she stated that her allergies were kicking up because of grass cutting and pollen. (Def. Ex. 38).

On December 2, 1994, a registered nurse stated that Ms. McIntyre "needs to have non-smoking roommate X 90 days." Another nurse stated, on February 24, 1995, that Ms. McIntyre needed a nonsmoking roommate "because of her respiratory condition." (Pl. Ex. 4A). Ms. McIntyre testified that she obtained a third nurse's note for a nonsmoking cellmate during her first month at MCI-W, but did not retain a copy of it. She gave these notes to officers in charge of her housing units. (Pl. Ex. 4; Pl. Ex. 36 at 141-44).

Ms. McIntyre wrote two letters to Warden Carter, to which she received no response, and requested a nonsmoking roommate in August 1994. (Pl. Ex. 36 at 230-31; Pl. Ex. 4B). On November 3, 1994, she complained about smoking in the recreation room. On November 27 and 30, 1994, she complained that a smoker had been moved into her room and requested a nonsmoking

35

roommate. On December 26, 1994, she wrote to Warden Carter that a smoker had been placed in her room on December 23, 1994. On April 3, 1995, she wrote to Governor Glendenning to complain about, inter alia, being housed with smokers. (Pl. Ex. 4B at 2-3, 12-18). On May 24, 1995, upon being given the opportunity to move, Ms. McIntyre requested to remain with her smoking roommate, stating that the roommate had kept her promise not to smoke in their room. (Def. Ex. 41). In February, March, April, and July of 1995, Ms. McIntyre complained about smoking in the recreation room and was told that she could use alternative recreation facilities and that officers would enforce the smoking ban when practicable. On July 3 and 4, 1995, she wrote to Warden Carter and Assistant Commissioner Anthony Swetz about violations of the new smoking ban. (Pl. Ex. 4B at 4-8, 28-29).

Dr. Munzer states that he has reviewed Ms. McIntyre's medical records and that they indicate that she has asthma and suffered numerous asthma attacks while incarcerated. He opines that these attacks were caused or aggravated by ETS. (Pl. Ex. 51).

4. James Minniefield-El.

Mr. Minniefield-El was incarcerated from October 1978 to July 1999; he was at ECI from August 1992 to October 1995, and September 1998 to February 1999, and was at MCIJ from October 1995 to September 1998, and from February to July 1999. He alleges that he has heart disease and hypertension, and cannot run, climb many stairs, walk long distances, or lift heavy weights. He alleges that he was frequently exposed to ETS at ECI and MCIJ in his cell and in the day rooms. (Pl. Ex. 5).

Mr. Minniefield-El complained about his cellmate's smoking on December 13, 1992. He was granted a nonsmoking cellmate in January 1993, after a physician's assistant wrote that he needed one. On October 13, 1993, a physician's assistant wrote that Mr. Minniefield-El should be housed

36

with a non-smoker "provided he doesn't smoke." On June 30, 1998, Mr. Minniefield-El again complained about a smoking cellmate and was again granted a change. On February 24, 1999, he complained about being housed with a smoker. On February 25, 1999, Warden Smith at MCIJ wrote to shift commanders that Mr. Minniefield-El was to be housed with a non-smoker. (Pl. Ex. 5A, 5B). A urine test performed on Mr. Minniefield-El in September 1998 indicated heavy exposure to ETS, but less than that seen in active smokers. (Pl. Ex. 57).

Dr. Munzer states that he reviewed Mr. Minniefield-El's medical records and met him.[25] He states that Mr. Minniefield-El has heart disease with angina and hypertension and incidents of unstable angina. He opines that the incidents of unstable angina were caused or aggravated by ETS, and that a prisoner with heart disease is very likely to experience an increase in the frequency of attacks of angina and heart attacks as a result of exposure to tobacco smoke. (Pl. Ex. 51). Mr. Repace states that, based on urine test and nicotine monitor results, Mr. Minniefield-El has a massive risk of developing heart disease and lung cancer. (Pl. Ex. 52).

    5. Desmond Malcolm.

Mr. Malcolm has been incarcerated at WCI since July 1998, and was incarcerated at ECI from April 1991 to July 1998. He alleges that he has been diagnosed with asthma since 1978, and had four asthma attacks prior to his incarceration in 1991. During his incarceration, he has had attacks at least weekly and often daily, and has extreme difficulty breathing. He alleges that he has been exposed to ETS in his cell and in the day rooms and halls throughout his incarceration, and that this smoke triggers his asthma attacks. (Pl. Ex. 3).

---

[25] In his affidavit, Dr. Munzer stated that he examined Mr. Minniefield-El; he corrected this at his deposition. (Paper No. 87, Ex. 1 at 124-25).

37

The ECI medical director, Dr. Sohr, wrote to Mr. Malcolm's housing unit in 1991, that he needed a nonsmoking cellmate due to his asthma. This direction was repeated in a physician's order dated June 30, 1997. (Pl. Ex. 3A). On July 14, 1995, Mr. Malcolm filed a complaint that his cellmate was smoking in the cell; on July 26, 1995, he was directed to resubmit the complaint on the correct form. He submitted a written request to be changed to a nonsmoking cellmate on August 26, 1997, which was denied due to the indoor smoking ban and alleged enforcement by staff. On November 13, 1998, he complained about smoking in the day room. This complaint was found to be meritorious in part in that inmates had occasionally violated the ban, and WCI staff was directed to re-emphasize and enforce the policy. On December 24, 1998, Mr. Malcolm appealed this response, seeking a ban on the sale of tobacco since the officers were not enforcing the ban on indoor smoking. The appeal was dismissed. (Pl. Ex. 3B).

Dr. Munzer states that he has reviewed Mr. Malcolm's medical records which indicate that he has asthma and has had numerous asthma attacks during his incarceration. He opines that these attacks are caused or aggravated by ETS. (Pl. Ex. 51).